[No. 2939.]

## JOHN G. ASHLOCK *v.* THE STATE.

1. THEFT—EVIDENCE—VENUE.—In a prosecution for the theft of a mare it was proved by the State that the animal was running in her accustomed range in C. county, and had been there for a week prior to the time she was seen in the defendant's possession in D. county. *Held*, sufficient to prove that, when taken, the animal was in C. county.

2. SAME—PRACTICE.—LEADING QUESTIONS are such as plainly suggest to the witness the answers sought to be elicited by the interrogator. "Did K. and R. tell you the day they saw the man in D.?" was not a leading question.

3. SAME—HEARSAY EVIDENCE.—The question as propounded called for and elicited hearsay testimony, but, in view of the fact that K. and R. testified as witnesses in the case, and stated in their testimony that they told the witness of whom the question was asked precisely what the said witness testified they told him, the admission of the answer to the said question is *held* not to be such error as to warrant the reversal of the conviction.

4. SAME—EVIDENCE—PRIVILEGE OF COUNSEL.—As tending to show bias, and for the purpose of enabling the jury to properly weigh the testimony of witnesses for the defense, it was proper to allow the State, on cross examination, to elicit from such witnesses the fact that they testi-

fied before the grand jury in the same case, without being subpœnaed, and at the instance of the defendant; and in referring to the facts so elicited, in argument, the counsel for the State did not abuse his privilege.

5. SAME.—CHARGES OF THE COURT are not tested by the strict rules applicable to indictments. All that is required of a charge is that it shall present the law of the case substantially and correctly, in a way that the jury will understand, and not be confused and misled by it. The objection urged to the charge in this case is that it does not instruct the jury that, in order to constitute theft, the taking of the animal must have been fraudulent. The charge, without using the statutory word "fraudulent" as descriptive of the taking, instructs the jury that if the defendant "took the mare with the fraudulent intent to appropriate her," etc. *Held*, sufficient.

6. SAME—REASONABLE DOUBT.—Upon the question of reasonable doubt the court charged the jury that if they had a reasonable doubt of the defendant's guilt, arising from the evidence in the case, they should acquit. *Held*, sufficient; and that the reasonable doubt is not required to be charged with reference to every, or any particular phase of the case.

7. SAME—CASE STATED.—The defense was that the defendant honestly acquired possession of the alleged stolen animal, having won her at a game of cards from one H. The evidence was to the effect that K., the owner, turned the animal out on November 12. On the fourteenth day of the same month a witness saw said H. in possession of an animal suiting the description of the one stolen. After this the mare in question was seen on her range for a week or more. A defense witness testified that, a day or two before the defendant was found in possession of the animal in D. he saw the defendant win her from H. at a game of cards; that the mare was not then present, but H. said that she was running at large in a certain lane. Upon this state of evidence the court charged the jury: "If you believe from the evidence that the defendant won the mare in controversy from some person who claimed to be the owner of said animal, at a game of cards, and that he believed such person to be the owner, you will find the defendant not guilty, notwithstanding you may believe that such person was not in fact the owner of the mare." The court refused an additional charge to the effect that if defendant acquired possession of the mare in any way from H., who had stolen her, he would not be guilty of theft, though he may have known that H. stole her. *Held*, that the charge as given was sufficient; that though the principle invoked by the special charge is correct in the abstract, its refusal was not error in this case, in view of evidence which disclosed that even if H. had stolen the animal prior to that time, he had abandoned possession of her, and she was again on her range and in the constructive possession of her true owner. The doctrine applicable to this case is that, when subsequently taken from her range by the defendant, that act constituted another and distinct taking, and if such taking was fraudulent it was theft, although authorized by H. See the opinion *in extenso* on the question.

8. SAME—POSSESSION OF RECENTLY STOLEN PROPERTY.—When relying upon the possession of recently stolen property, to convict, the State is required only to prove the falsity of the defendant's explanation made at the time his possession was challenged. The State cannot be required to disprove every conflicting explanation the defendant may make. See the opinion in illustration.

APPEAL from the District Court of Collin. Tried below before the Hon. R. Maltbie.

The indictment charged the appellant with the theft of a mare, the property of Allen Kelly, in Collin county, on the twelfth day of November, 1883. His trial resulted in a verdict of guilty, and his punishment was assessed at confinement in the penitentiary for the term of five years.

Sam Reynolds was the first witness for the State. He testified, in substance, that he was at a livery stable in the city of Dallas, on the twenty-second day of November, 1883. While the witness was there the defendant came up, riding a black horse and leading a bay mare. Some one asking the defendant if he wanted to trade the mare, witness's attention was directed to the animal, which he knew well. The defendant replied to the inquiry referred to, that he did not wish to trade, but that he would sell the animal. Witness then stopped defendant, examined the mare, and said to defendant: "I know this mare; you got her from Allen Kelly." Defendant replied: "No, I got her from Fox Smith." Witness replied: "I know Fox Smith," and asked defendant his name. Defendant answered: "John Ashlock." Witness replied to defendant: "I have often heard of you, but have never seen you before." Defendant then asked witness his name, and it being given him he said: "I have often heard of you but have never seen you before." The mare led by the defendant was of bay color, rather heavily built, and rather crestfallen in the shoulders, as though she had had the fistula. She was branded JCT, the two first letters connected, the stem of the T forming a script J. She also had a wart on the left pastern joint. In this conversation the defendant told the witness that Fox Smith had made a crop with the mare, and that he, the defendant, had had her in his pasture for the preceding three weeks.

The witness encountered the defendant again on the next morning, and learned from him that he had sold the mare. Some two or three weeks later Allen Kelly came to witness and

asked him to go with him to McKinney to see about his mare. Witness and Kelly first went to Coleman's and told him that witness saw the animal in Dallas on November 22, preceding. Thence they went to the house of the defendant, reaching there about sundown. They proposed to the defendant to go with them to Fox Smith's and see about the manner in which he, defendant, acquired possession of the mare. Defendant then said that he did not get the mare from Fox Smith, but traded for her in the forks of Elm and Pecan creeks, and that there was a man living in McKinney who knew where he got the animal. Kelley and witness then proposed to him to go with them to McKinney and see Ganezer, the man to whom he sold the animal in Dallas. The defendant agreed, and after occupying about twenty minutes in saddling his horse, went with witness and Kelly. When they met Ganezer the defendant paid him back fifty dollars, the purchase money of the animal. She was well worth seventy-five or eighty dollars. While the parties named were in McKinney, a man named Hartin either came up or was sent for, and said that defendant traded for the mare in the forks of Elm and Pecan creeks. The defendant had made about the same statement during the evening.

Cross-examined, the witness stated that he was in the city of Dallas from the twenty-first to the twenty-fourth of November, 1883. He first saw the mare in the possession of the defendant on the twenty-second day of that month. On the twenty-third day of that month, which was the next day, the defendant brought the mare and the man Ganezer, to whom he had sold her, to where the witness was lodging, and told Ganezer that witness knew the mare and could tell him all about her. Witness told Ganezer what he knew of the animal in the presence of the defendant. Witness left Dallas on the succeeding Sunday morning, and at some distance out was overtaken by the defendant, and the two rode some miles together. In the conversation in McKinney, referred to above, the defendant said that the mare was not present when he traded for her in the forks of Elm and Pecan creeks, but that, to his knowledge at that time, she was running in Coleman's lane. From Coleman's place in Collin county to the city of Dallas, the distance is about thirty-five miles.

Allen Kelly, the second witness for the State, testified that he owned the stolen animal at the time of the theft, and described her as she was described by the witness Reynolds. As

had long been his custom, the witness turned her out to graze on the evening of November 12, 1883. She did not, as usual, come up on the next morning. About two weeks later witness went to Dallas and learned that she was in the possession of one Ganezer, who had purchased her. A few days later than this, with Reynolds as company, witness went to see the defendant about her, and to get him to go with them to see Fox Smith. Defendant then said that he did not get her from Fox Smith, but traded for her at Yonkepin lake, in the forks of Elm and Pecan creeks.

Fox Smith testified, for the State, that he had known the defendant all his life in Collin county, where he had always lived. The witness had never traded him a bay mare. He had never heard the defendant's honesty questioned.

J. T. Coleman testified, for the State, that he had known the defendant since his childhood. A lane runs between the houses of the witness and the defendant's father, which are situated about a mile apart. Witness remembered the time Kelly lost his mare. He had seen a bay mare in the lane near his house, bearing the brand described by the witnesses Kelly and Reynolds. She had also a white foot on the left leg, a flesh mark not mentioned by the other witnesses named. This mare was one that the witness had owned and given to his son some eighteen months before. The witness saw her almost daily for six or seven days, the last time on the Tuesday or Wednesday before she was seen in Dallas. On one Saturday evening Kelly and Reynolds came to the witness's house and told him that on the twenty-second or twenty-third of November the mare was seen in Dallas. Kelly and Reynolds left the witness's house to go to Ashlock's. Witness never saw the mare in the defendant's possession. She at one time ran with the horses of defendant's father. Defendant lived about two miles east of witness.

Bord. Coleman, the son of the last witness, testified, for the State, that he saw a mare answering to the description given of that alleged to have been stolen by the defendant, in the lane near his father's house, several times. He first saw her there on Tuesday, November 16, 1883. She remained in that neighborhood until the Wednesday of the following week. He last saw the mare in the lane near his father's house on the twentieth day of November, 1883.

Sheriff Williams Warden testified, for the State, that the de-

fendant, with Kelly and Reynolds, came to his office in McKinney at night about the first of December, 1883. In answer to questions the defendant said that he traded for the mare he was charged with stealing on Yonkepin lake, in the forks of Little Elm and Pecan creeks; that the mare was not present at the time he made the trade. A man named Hartin, being sent for by defendant, came to the office and said that defendant got the mare at Yonkepin lake. Witness had never had process for Hartin. At this point the State closed.

Charles Hart was the first witness for the defense. He testified that he was, and had been a resident of Denton county for seven or eight years. He was a farmer by occupation. About the middle of November, 1883, the witness was in and about the forks of Elm and Pecan creeks on a cow hunt. He came upon the defendant and a man named Hubble, sitting down on the ground on the banks of Yonkepin lake, playing cards. Defendant attempted to hide something under his leg, as the witness rode up. Witness saw that the article was a deck of playing cards. After some talk witness asked if either of the parties had seen a certain cow. A little later Hubble asked witness if, in his rounds, he saw anything of a bay mare with brands and flesh marks as described by the witnesses. Witness answered that he had not. The parties then played one or two games of cards in the presence of the witness. On one of these Hubble staked the mare against the defendant's horse. Defendant won the game, and the mare. Witness left the parties within a few minutes and saw nothing more of either of them until about one month before this trial, when defendant came to him in the town of Denton and asked him if he remembered the occasion of his winning the mare from Hubble at Yonkepin lake. Witness replied that he did.

On cross-examination, the witness stated that Hubble was a young man, about twenty-six years of age, rather above average height, measuring perhaps six feet, wearing neither whiskers nor mustache. Witness did not remember the color of his hair, eyes or clothes. The defendant's horse was of a black or brownish color. The witness could not describe Yonkepin lake, further than that it was surrounded by timber and cleared spaces. The witness was examined before the grand jury, testifying then as he testifies now. Witness was not summoned before the grand jury. He paid his own expenses, but expects to recover his fees; if not, he expects the defendant to reimburse

him.   The game played by Hubble and defendant was seven up. Witness was in no way related to the defendant.

C. C. Davis testified, for the defendant, that he resided in Collin county with his brother-in-law, Barn Hill.   He was visiting in Denton county on November 10, 1883, and returned home between the twelfth and fourteenth of that month.   When near Lloyd, a post office in Denton county, about thirteen miles from his home, the witness met up with a man riding a heavy set bay mare, answering in brands and flesh marks that alleged to have been stolen by defendant.   This man, whose name witness did not then learn, stopped at Lloyd.   A short time later the witness met this man at Meredy Sullivan's, and then learned that his name was Hubble.

Cross-examined, the witness testified that Hubble was a heavy set man, twenty-three or twenty-four years old, freckled faced and red complexioned.   When at Sullivan's he was dressed in black clothes, and rode a very small bay horse pony.   Previous to seeing Hubble riding the mare, the witness had seen the animal in Coleman's lane.   It was this circumstance that engaged his notice when he saw the animal in Hubble's possession. Hubble did not dismount at Sullivan's.   He wore no hair on his face.   Witness was in no way related to the defendant.

Z. B. Warrick testified, for the defendant, that he had seen the man J. B. Hubble, who threshed wheat at Meredy Sullivan's place during the year 1883.   Sometime in December of that year the witness and defendant went on a stock hunt to Little Elm, in Denton county, a mile or two distant from Lloyd's.   On the edge of Denton county they met Hubble.   Defendant told Hubble that Kelly claimed and had proved and taken the mare which he, defendant, had got from him, Hubble, and defendant then and there demanded a bill of sale from Hubble.   Hubble drew away, looking somewhat confused and uneasy, and said that he would execute the bill of sale.   Thence the three went to the house of Hubble's mother, where Hubble executed the bill of sale, signing it with a lead pencil that made a blue mark. Here the bill of sale was read in evidence.

Cross-examined, the witness testified that Hubble was of moderate size and light complexion.   When the parties reached Mrs. Hubble's house, defendant and Hubble went to a table and did some writing there.   Witness did not know whether the bill of sale was then written, or whether defendant had previously prepared it.   It, however, was signed at that time by Hubble,

and defendant wrote witness's name to it as a witness. The witness could not write himself. Witness did not hear defendant say anything to Hubble about being a witness. Witness and defendant were out hunting stock two days. Passed one night at Hart's farm. Witness was not related to the defendant. He went before the grand jury at the instance of the defendant, without process of any kind, paying his own expenses, which he expects the defendant to reimburse, if he should fail to get his fees.

M. Ashlock, the defendant's father, testified in his behalf that in the fall of 1883, the defendant had authority from him to trade or sell any of his horse stock running on Elm creek or the "Flats." Defendant had often traded horse stock. He owned four horses in his own right at the time he obtained the mare he is charged to have stolen. Defendant has a house of his own, a wife and two children.

A. L. Echhart testified, for the defense, that he had known the defendant for eight years, and had never heard his honesty questioned before he was accused of this theft. Joe Wyrick, witness's brother-in-law, and the defendant came to witness's house in Denton county one night in December, 1883, and remained there until morning, when defendant, Wyrick and witness went to the town of Denton. Witness saw the witness Hart in Denton on that day. Witness was before the grand jury, at the defendant's instance, without process, at his own expense, in which he expected to be reimbursed either by the State in fees, or by the defendant.

G. T. Thomas, the defendant's attorney, testified for the State, in rebuttal, that he inquired for Hubble but could not find him. He understood that he had left the country, and had no process issued for him.

The motion for new trial presented the question involved in the opinion.

*Abernathy Bros.* and *G. F. Thomas*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. It was sufficiently proved that the offense was committed in Collin county, the county of the prosecution. The stolen mare was running in her old range, where she had been raised, in Collin county, and had been there for a

week prior to the time she was seen in defendant's possession in Dallas county. This was sufficient to prove that when taken she was taken in Collin county.

2. Witness Coleman was asked: "Did Kelly and Reynolds tell you the day the mare was seen in Dallas?" This question was objected to by defendant because it was leading, and because it sought to elicit testimony which would be mere hearsay. The objections were overruled, and the witness stated that Kelly and Reynolds told him that the mare was seen in Dallas on the twenty-second or twenty-third of November, 1882. We do not think the question in its form was a leading one. It is not every question which may be answered "yes" or "no" that is a leading question. A leading question is one which puts into the mouth of the witness the words to be echoed back, or plainly suggests the answer which the party propounding it wishes to get from him. This question did not suggest any answer, but merely led the mind of the witness to the subject of inquiry, which is permissible even in an examination in chief. That it called for hearsay testimony, and did in fact elicit such testimony, is true, and a strict enforcement of the rules of evidence would exclude the answer of the witness. But we do not think the admission of the witness's answer, in view of the facts of this case, such error as would authorize a reversal of the judgment. It appears from the record that Kelly and Reynolds testified in the case, and they stated in their testimony that they had told the witness Coleman precisely what he testified they had told him, thus supplying and superceding the hearsay statement objected to. Besides, the statement of Coleman as to what Kelly and Reynolds told him could have no appreciable bearing upon any issue in the case, and was therefore wholly immaterial when considered in connection with the testimony of Kelly and Reynolds. (*Gose* v. *The State*, 6 Texas Ct. App., 121; *Reynolds* v. *The State*, 8 Texas Ct. App., 412.)

3. We think the district attorney had the right, on the cross-examination of defendant's witnesses, to elicit from them that they had testified before the grand jury in this same case, and had done so without being subpœnaed, and at the instance of defendant, etc. This was allowable for the purpose of showing the bias of the witnesses in favor of the defendant, and to enable the jury to properly weigh the testimony of said witnesses. (*Stevens* v. *The State*, 7 Texas Ct. App., 39.) We think, further, that the district attorney in his argument to the jury

did not infringe upon the rules in referring to the facts thus elicited, and we perceive nothing to condemn in his remarks so far as they are set forth in the record. He stated nothing but what had been proved before the jury, and the record does not show, as contended by appellant's counsel, that he argued to the jury that, because the grand jury had found the bill of indictment, having the testimony of defendant's witnesses before them, therefore the trial jury should also disregard the testimony of these witnesses and convict.

4. It is objected to the charge of the court that, in stating the elements of the offense of theft, it does not instruct the jury that the *taking* must have been *fraudulent*. The charge instructs the jury that "if the defendant took the mare with the *fraudulent* intent to appropriate her," etc., and does not use the statutory word "fraudulent" as descriptive of the *taking*. Were this objection made to an indictment thus describing the offense, it would be well made. (*Muldrew* v. *The State*, 12 Texas Ct. App., 617.) But we are not to test a charge by the strict rules applicable to an indictment. All that can be reasonably required in a charge is that it should present the law of the case substantially and correctly, in a way that the jury will understand, and not be confused or misled by it. In the charge under consideration, the jury were told that if the defendant took the mare with the fraudulent intent to appropriate her to his own use and deprive the owner of the value thereof, such taking would be theft. While this would not be sufficient in an indictment, we certainly think it is sufficiently accurate in a charge. If the intent to appropriate the property and deprive the owner of the value of it was a fraudulent one, and existed at the time of the taking, then the taking could not have been otherwise than fraudulent, and the jury could not possibly have been misled as to the law of the case by the omission in the charge to qualify the taking by the word "fraudulent." There was no exception taken at the trial to this portion of the charge, and while in our opinion it would have been more perfect if it had qualified the taking by the use of the word *fraudulent*, still this error, if it be an error, was not calculated to prejudice the rights of the defendant, and is therefore not of a character to affect the judgment.

5. In answer to the objections made to the charge of the court upon the rule governing circumstantial evidence, it is sufficient to say that it was substantially correct and was not ex-

cepted to; and we cannot see that the defendant has been prejudiced thereby.

6. By the charge the jury were instructed that, if they had a reasonable doubt of the defendant's guilt, arising from the evidence in the case, they should acquit him. This was sufficient. It was not required that this instruction should be given with reference to every or any particular phase of the case. (*McCall* v. *The State*, 14 Texas Ct. App., 353.) There was no error, therefore, in refusing the special charge requested by defendant.

7. The defense relied upon was that defendant came into the possession of the mare in good faith; that he won her at card playing from one Hubble. It appear from the evidence that Kelly, the owner of the mare, turned her out on the range November 12. On the fourteenth day of the same month one of defendant's witnesses testified that he saw a man whom he afterwards learned was named Hubble, in possession of a mare suiting the description of the animal stolen. After this Kelly's mare was seen at Coleman's, her old range, and was observed there for a week or more. On the twenty-second or twenty-third of November, defendant had possession of her and sold her in Dallas. It was testified to by one of defendant's witnesses that, a day or so before defendant was seen with the mare in Dallas, he, witness, was present in the woods at Yonkepin lake, between the forks of Elm and Pecan creeks, and saw defendant win the mare at card playing from one Hubble; that the mare was not present at the time, but that Hubble said she was running at large in Coleman's lane, and that defendant bet his horse against the mare and won her.

Upon this state of evidence the court charged the jury as follows: "If you believe from the evidence that the defendant won the mare in controversy from some person who claimed to be the owner of said animal, at a game of cards, and that he believed such person to be the owner, you will find the defendant not guilty, notwithstanding you may believe that such person was not in fact the owner of the mare." It is insisted that under the facts of this case the court should have further charged that if defendant acquired possession of the mare in any way from Hubble, who had stolen her, that he, defendant, would not be guilty of the theft, although he might have known that the animal was stolen property. In a proper case such a further charge would be correct, but, with reference to the facts of this case, it was not, in our opinion, demanded, and

would not have been applicable. The mare was not in the possession of Hubble when defendant won her. She was in her accustomed range and in the constructive possession of her owner. Defendant did not acquire possession of her from Hubble. If Hubble had, prior to that time, stolen her, he had turned her loose, abandoned possession of her, and she was no longer a stolen animal, but was in the legal possession again of her true owner. This being the case, the prior theft of the mare by Hubble cannot be availed of as a defense. When the mare was subsequently taken from her range, the taking constituted another and distinct taking, and if the act was fraudulent it was theft, although authorized by Hubble. That is, if Hubble had stolen the mare and then turned her loose, so that she was again in the possession of her owner, and defendant had, while the mare was thus in possession of the owner, purchased or won her from Hubble, and then took her, such taking would be theft, if fraudulent and with a knowledge on the part of defendant that Hubble did not own her; because he did not acquire possession of the property from Hubble, but took it from the possession of the owner. We think the charge of the court upon this branch of the case went as far as the facts demanded it should, and that it was as favorable to defendant as it should have been.

8. When defendant had the mare in Dallas he was asked by a witness who knew her, from whom he had obtained her? and he answered, from Fox Smith. It was admitted afterwards by defendant, and also conclusively proved on the trial, that this statement was false. Subsequently, when pressed more closely upon the subject, he stated that he had bought the animal of a stranger, in the fork of Elm and Pecan creeks. It is contended by his counsel that this was a reasonable explanation of his possession, and that it devolved upon the State to show the falsity of it. Conceding that it was a reasonable explanation, we do not think the State was called upon to disprove it. When defendant's possession was first challenged, he said he got the mare from Fox Smith. This statement the State proved to be false. This was all the law required the State to do. It would be unreasonable, and not the law, to require the State to disprove every explanation which a defendant might give, however reasonable, of his possession of stolen property. This requirement extends no farther than to the explanation given when his possession is for the first time questioned.

Other questions are raised in the record than those we have noticed, but in our judgment they are unimportant, and do not require discussion. We have found no such error in the record as in our opinion would warrant a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*

Opinion delivered April 16, 1884.